**UNITED STATES DISTRICT COURT**
**FOR NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| COMMONWEALTH OF MASSACHUSETTS, | Case No. 1:20-cv-02658 |
| and | |
| STATE OF WISCONSIN, | |
| *Plaintiffs,* | |
| v. | |
| DAIRY FARMERS OF AMERICA, INC. | |
| and | |
| DEAN FOODS COMPANY, | |
| *Defendants.* | |

**COMPETITIVE IMPACT STATEMENT**

The United States of America, under Section 2(b) of the Antitrust Procedures and

Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), files this Competitive

Impact Statement relating to the proposed Final Judgment submitted for entry in this civil

antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Dean Foods Company ("Dean") filed for bankruptcy on November 12, 2019, in the

United States Bankruptcy Court for the Southern District of Texas. The bankruptcy court ordered

an auction and then accelerated the auction process because of Dean's liquidity condition. On

March 30, 2020, Dairy Farmers of America, Inc. ("DFA") bid for 44 of Dean's plants for a total

value of $433 million. No other bidder submitted a bid for the 44 Dean plants, or anything even close to that number of plants, under the bankruptcy court's schedule. The bid was accepted by Dean and was the only transaction for those 44 plants approved by the bankruptcy court.

The United States, along with the state of Wisconsin and the Commonwealth of Massachusetts (collectively, the "Plaintiff States"), filed a civil antitrust complaint on May 1, 2020, seeking to enjoin the proposed transaction. Based on a comprehensive investigation, the Complaint alleges that the likely effect of this transaction would be to substantially lessen competition for the processing and sale of Fluid Milk in areas encompassing (1) northeastern Illinois and Wisconsin and (2) New England in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. "Fluid Milk" is raw milk that has been processed for human consumption as a beverage, but does not include organic milk, soy milk, extended shelf life milk, ultra-high temperature milk, or aseptic milk.

At the same time the Complaint was filed, the United States filed an Asset Preservation and Hold Separate Stipulation and Order ("Stipulation and Order") and proposed Final Judgment, which are designed to address the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, DFA is required to divest Dean's Fluid Milk processing plants, ancillary facilities, and related tangible and intangible assets located in Franklin, Massachusetts ("Franklin Plant"); De Pere, Wisconsin ("De Pere Plant"); and Harvard, Illinois ("Harvard Plant") (collectively the "Divestiture Plants"). Under the terms of the Stipulation and Order, Defendants will take certain steps to ensure that, during the pendency of the required divestitures, the Divestiture Plants will remain independent and ongoing business concerns that will remain uninfluenced by Defendants and the level of

competition for the processing and sale of Fluid Milk that existed between Defendants prior to the transaction will be maintained.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### (A)    The Defendants and the Proposed Transaction

Dean is a Delaware corporation with its headquarters in Dallas, Texas. Until its recent bankruptcy filing, Dean was the largest Fluid Milk processor in the country, operating at that time 57 Fluid Milk processing plants in 29 states. Dean had 2018 revenues of $7.75 billion.

DFA is organized under the laws of the State of Kansas and is the largest cooperative of dairy farmers in the country, with nearly 14,000 members. In 2018, DFA marketed 64.5 billion pounds of raw milk—an amount that accounted for approximately 30% of all raw milk produced in the United States. DFA had 2018 revenues of $13.6 billion.

DFA is vertically integrated through its ownership interests in milk processing plants. DFA owns eight Fluid Milk processing plants around the country and has a significant stake in a joint venture that owns twelve additional Fluid Milk processing plants. In the northeastern Illinois and Wisconsin area, DFA owns a Fluid Milk processing plant in Cedarburg, Wisconsin. In the New England area, DFA owns Fluid Milk processing plants in New Britain, Connecticut and Portland, Maine. These plants compete directly against the Harvard Plant, De Pere Plant, and/or Franklin Plant that DFA proposes to acquire from Dean.

Dean filed for Chapter 11 bankruptcy protection on November 12, 2019. Simultaneous with the bankruptcy filing, Dean announced that it was in discussions to sell some or all of its Fluid Milk processing plants to DFA. Dean's financial position continued to worsen in the months after its bankruptcy filing and then was exacerbated by shrinking school and restaurant demand for milk caused by the coronavirus pandemic. Dean informed the bankruptcy court of its worsening financial condition and that it would not be able to pay farmers for raw milk or be certain that it could continue to process Fluid Milk beyond May 2020. Dean's worsening financial condition caused the bankruptcy court to accelerate the bankruptcy auction process to allow Dean to find buyers for its assets before the company would have to cease operations due to a lack of funds. By order of the bankruptcy court, Dean accepted bids for its assets and selected winning bidders on March 30, 2020. Dean selected DFA as the winning bidder for most of Dean's assets and began the process of closing down some plants that no one had sought to acquire during the bankruptcy process.

On March 31, 2020, DFA and Dean entered into an asset purchase agreement whereby DFA agreed to purchase 44 of Dean's 57 Fluid Milk processing plants, along with related assets, for $433 million. The purchase price includes $325 million in cash and $108 million in forgiveness of debt Dean owed DFA.

**(B)     The Competitive Effects of the Proposed Transaction**

DFA's existing Fluid Milk processing plants overlap with two Dean plants that it proposes to acquire in northeastern Illinois and Wisconsin—the Harvard Plant and the De Pere Plant—and with Dean's Franklin Plant in New England. The Complaint alleges that DFA and Dean are two of only three significant Fluid Milk processors that can serve customers, including supermarkets and schools, in each of these geographic areas. If the acquisition were permitted to

proceed, DFA would control nearly 70% of the Fluid Milk market in northeastern Illinois and Wisconsin and approximately 51% of the Fluid Milk market in New England. DFA and Dean compete head-to-head to supply Fluid Milk customers in these areas today, and those customers rely on competition between DFA and Dean to get lower prices and better terms. If DFA's and Dean's plants in these areas were owned by a single entity, this competitive dynamic would no longer exist, leading to higher prices and inferior service for supermarkets, schools, and other Fluid Milk customers and ultimately, millions of individual consumers.

*1.* ***The processing and sale of Fluid Milk is a relevant product market***

The Complaint alleges that the processing and sale of Fluid Milk is a relevant product market and line of commerce under Section 7 of the Clayton Act. Consumers have long-held cultural and taste preferences for Fluid Milk over other beverages, and Fluid Milk has particular nutritional benefits and qualities for use in cooking. Consequently, consumer demand for Fluid Milk is relatively inelastic, which simply means that Fluid Milk consumption does not decrease significantly in response to a price increase. Fluid Milk is distinct from organic milk, soy milk, extended shelf-life milk, ultra-high temperature milk, and aseptic milk, which are produced by different processes, have numerous significant differences, and generally cost much more than Fluid Milk.

The Complaint alleges that retailers, supermarkets, distributors, and other Fluid Milk customers are unlikely to substitute other products for Fluid Milk because the individual consumers that they serve continue to demand Fluid Milk. This means, for example, that a grocery store would not substitute to other beverages because its customers will not buy other beverages as an alternative to Fluid Milk. Schools are similarly unlikely to substitute away from Fluid Milk in response to even a substantial price increase because they are required by federal

5

regulations to offer Fluid Milk to students in order to qualify to receive federal reimbursements for meals served to lower-income students.

For these reasons, the Complaint alleges that the processing and sale of Fluid Milk satisfies the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice and Federal Trade Commission *2010 Horizontal Merger Guidelines* ("*Horizontal Merger Guidelines*"). This test asks whether a hypothetical monopolist processing and selling Fluid Milk likely would impose a small but significant and non-transitory price increase (*e.g.*, five percent) because an insufficient number of customers would switch to alternatives to make that price increase unprofitable. The Complaint alleges that this test is satisfied.

2. ***The two relevant geographic markets are northeastern Illinois and Wisconsin and New England***

The Complaint also alleges two relevant geographic markets: (1) northeastern Illinois and Wisconsin and (2) New England. Fluid Milk processors charge different prices to buyers in different areas. Prices are negotiated individually, and Fluid Milk's high transportation costs and limited shelf life mean that customers cannot practically buy Fluid Milk from each other to avoid a higher price charged by processors. In other words, Fluid Milk processors can engage in "price discrimination," meaning that they can charge different prices to different customers. When price discrimination is possible, relevant geographic markets may be defined by reference to the location of the customer. In particular, a relevant geographic market for the processing and sale of Fluid Milk, as alleged in the Complaint, is a region within which customers can be targeted for a price increase. Most customers purchase Fluid Milk from suppliers and processing plants

located near them because transportation costs and shelf life make sourcing from more distant suppliers prohibitive.

The Complaint alleges that northeastern Illinois, which includes Chicago and its suburbs, and the state of Wisconsin together comprise a relevant geographic market and section of the country within the meaning of Section 7 of the Clayton Act. Similarly, New England—including the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont— is a relevant geographic market and section of the country within the meaning of Section 7 of the Clayton Act. A hypothetical monopolist processing and selling Fluid Milk in either of these two areas likely would find it profitable to impose a small but significant and non-transitory price increase (*e.g.*, five percent) because customers could not economically switch their source of supply to more distant sources.

### 3. *The acquisition results in large combined market shares*

DFA's acquisition of Dean's Fluid Milk processing plants would result in a substantial increase in the concentration of processors that compete to supply Fluid Milk to customers in the northeastern Illinois and Wisconsin geographic market and the New England geographic market. The Complaint alleges that DFA and Dean are two of only three significant Fluid Milk processors that sell into each of these geographic markets. In both geographic markets, the acquisition would eliminate one competitor, leaving only two remaining competitive options for Fluid Milk customers, with DFA controlling a significant majority of the Fluid Milk sales. Although there are also small or fringe Fluid Milk processors in each market, these processors are not competitive options for most Fluid Milk customers because they are much smaller and lack the capabilities necessary to compete against processors like DFA and Dean.

The Supreme Court has held that mergers that significantly increase concentration in already concentrated markets are presumptively anticompetitive and therefore presumptively

unlawful. To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI") as described in the *Horizontal Merger Guidelines*. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has a 100% market share. According to the *Horizontal Merger Guidelines*, mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive and, therefore, unlawful.

The Complaint alleges that the acquisition of Dean's plants by DFA is presumptively unlawful in northeastern Illinois and Wisconsin. For Fluid Milk customers in this geographic market, a conservative estimate of the combined market share of Dean's Harvard Plant and De Pere Plant and DFA's processing plant in Cedarburg, Wisconsin is 70%. The result is a highly concentrated market with an HHI of nearly 5,200 and an increase in HHI of almost 1,900.

As alleged in the Complaint, the acquisition is also presumptively unlawful in the New England geographic market. For Fluid Milk customers in the New England geographic market, a conservative estimate of the combined market share of Dean's Franklin Plant and DFA's processing plants in New Britain, Connecticut, and Portland, Maine is 51%. The result is a highly concentrated market with an HHI of approximately 3,300 and an increase in HHI of over 1,000.

4.     *The merger would eliminate head-to-head competition between DFA and Dean*

The Complaint alleges that DFA's acquisition of Dean's plants in northeastern Illinois and Wisconsin and in New England would eliminate head-to-head competition that has benefitted and would otherwise continue to benefit supermarkets, schools, and other Fluid Milk customers in the relevant geographic markets. For reasons related to service and delivery capabilities, some Fluid Milk customers consider DFA and Dean to be their only practical options. Especially for customers like large supermarket chains, DFA and Dean are two of only

three competitive Fluid Milk processors in these geographic markets, and they are often the two lowest-price options in these geographic markets.

Customers often solicit bids from Fluid Milk processors and select the bidder that offers the lowest price. These customers often leverage a lower-priced bid from one supplier to obtain improved offers and lower prices from other bidders during individual negotiations. Even customers who use less formal procurement processes benefit from the presence of competitive alternatives, which constrain the prices that all Fluid Milk processors can charge. The Complaint alleges that Fluid Milk customers in the relevant geographic markets have historically used competing bids from DFA and Dean to obtain lower prices.

As described above, the Complaint alleges that customers typically purchase Fluid Milk from processing plants located close to them because of shelf-life restrictions and the costs associated with transportation of the product. These transportation costs comprise a significant portion of the prices that Fluid Milk processors charge customers. Therefore, the lowest-price Fluid Milk processors available to customers typically are the ones located closest to them. For many Fluid Milk customers in the relevant geographic markets, DFA and Dean are two of the closest processing plants and, as the Complaint alleges, two of the most competitive or lowest-price options. The only other significant competitors selling Fluid Milk to customers in these markets are unlikely to substantially mitigate the loss of competition between DFA and Dean that would result from the acquisition.

Many customers also have particular product and service requirements that not all Fluid Milk processors can meet. Supermarkets, convenience stores, schools, and other customers often require processors to arrange direct-store delivery, or "DSD," where the processor delivers Fluid Milk to each of the customer's locations on a set schedule—sometimes as often as daily. Schools

typically require milk to be packaged in small half-pint containers that require a separate bottling line and dedicated equipment. Only DFA and Dean, along with the third significant competitor in each of the relevant geographic markets, can satisfy these complex product and service requirements, while other smaller processors cannot.

5.      *The acquisition would make it easier for competitors to coordinate*

The Complaint alleges that by reducing the number of significant Fluid Milk processors in northeastern Illinois and Wisconsin and in New England from three to two, the acquisition would make it easier for the remaining two significant processors to coordinate. Markets, such as Fluid Milk markets, with few significant competitors, relatively homogenous products, and where demand for the product is not significantly affected by an increase in its price are susceptible to coordination because these features are among those that make coordination more likely to be effective and profitable.

In addition, there is a history of anticompetitive coordination, including price fixing, bid rigging, and customer allocation in Fluid Milk markets in the United States and, in particular, in the sale of milk to schools. Numerous Fluid Milk processors, including Dean itself, have engaged in criminal collusive activities at various times over the last 40 years. Given this history of coordination among Fluid Milk processors and the reduction in the number of significant competitors in each of the relevant geographic markets, the acquisition makes coordination more likely to occur in these markets.

6.      *Potential entrants and merger efficiencies do not offset competitive harm from the merger*

As alleged in the Complaint, entry by Fluid Milk processors outside the relevant geographic markets is unlikely to be sufficient or timely enough to offset the anticompetitive effects of the acquisition. Processors who do not currently serve these markets are unlikely to

begin shipping a significant quantity of Fluid Milk into the relevant geographic markets due to the same factors that make them uncompetitive in these markets today, including transportation costs and the lack of necessary capabilities or levels of service. Any milk that could be shipped into the relevant geographic markets likely could not be competitively priced because of the high transportation costs. Nor could these processors economically deliver Fluid Milk to customers like schools because they lack local distribution networks.

The construction of a new Fluid Milk processing plant to serve customers in either of the relevant geographic markets is very unlikely because of the high costs of building a Fluid Milk processing plant—especially as Fluid Milk consumption continues to decline. Numerous Fluid Milk processing plants have closed in the last ten years across the United States, while only a few new plants have been built, and these newly-built plants were largely for retailers to supply their own stores. Finally, the two largest Fluid Milk processors in the country, Dean and Borden Dairy Company, have filed for bankruptcy.

The Complaint also alleges that potential harm from the proposed merger is unlikely to generate verifiable, merger-specific efficiencies sufficient to outweigh the anticompetitive effects that are likely to occur in the provision of Fluid Milk in the relevant geographic markets.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestitures required by the proposed Final Judgment will remedy the loss of competition alleged in the Complaint by establishing independent Fluid Milk processing competitors in northeastern Illinois and Wisconsin and in New England. The proposed Final Judgment requires DFA to divest Dean's De Pere Plant, Franklin Plant, and Harvard Plant, related ancillary facilities (such as warehouses and sales offices), and tangible and intangible assets related to or used in connection with the processing, marketing, sale, or distribution of

Fluid Milk and all other products by each of the Divestiture Plants. The divestitures are to occur within 30 days (with extensions that may be granted in the sole discretion of the United States not to exceed 60 days) after the entry of the Stipulation and Order by the Court.

**(A)    The Divestiture Plants**

The proposed Final Judgment defines three sets of divestiture assets, one for each Divestiture Plant. Each set of assets must be divested in such a way as to satisfy the United States in its sole discretion, after consultation with the Plaintiff States, that they can and will be operated by the purchaser as a viable, ongoing business that can compete effectively in the market for the processing and sale of Fluid Milk in the relevant geographic market. Defendants must use their best efforts to accomplish the divestitures as expeditiously as possible and must cooperate with potential divestiture buyers.

The proposed Final Judgment requires that a single divestiture buyer acquire both the De Pere Plant and the Harvard Plant, unless the United States exercises its discretion to permit separate purchasers. The United States prefers that the Harvard Plant and De Pere Plant be sold together because the plants will likely be able to more successfully compete if operated jointly. Though the Harvard Plant and De Pere Plant could each operate independently, divesting them to the same buyer would more closely replicate for the buyer the advantages that Dean held before the transaction, including, among others, the ability for the plants to (1) assist each other with operations and distribution, including the capability to serve as backup for each other, (2) serve a contiguous set of customers, and (3) share the regional "Dean's" brand. The United States maintains the sole discretion to approve separate buyers for the Harvard Plant and De Pere Plant under the proposed Final Judgment if it can be demonstrated to the United States that separate buyers can restore the competition that the Complaint alleges would have been lost by the

transaction. The Franklin Plant, which is in a different geographic market than the Harvard and De Pere Plants, may be divested to a different purchaser.

### (B)     Brands and Licenses

Branded milk represents a distinct minority of total Fluid Milk sales at the Divestiture Plants. The majority of Fluid Milk sales are for private-label products—that is, products labeled with the brand of the retailer rather than the manufacturer. Nevertheless, in order to protect the viability of the Divestiture Plants and related businesses that will be divested, the proposed Final Judgment requires a combination of brand divestitures and brand licenses that are based upon a fact-specific analysis of the historic sales by each individual Divestiture Plant.

The brands used at each of the Divestiture Plants varies among a combination of local or sub-regional, regional, and national brands. The local or sub-regional brands include Garelick Farms, which is used at the Franklin Plant, and Morning Glory and Farm Fresh, which are both used at the De Pere Plant. The regional "Dean's" brand is used at the De Pere Plant and the Harvard Plant. Dean's national brands—used at all three Divestiture Plants—are Dairy Pure and Dean's chocolate milk brand, TruMoo. Dean typically uses Dairy Pure as a cobrand with local or sub-regional brands and regional brands, including the Garelick Farms, Morning Glory, and Farm Fresh brands used at the Divestiture Plants.

The local or sub-regional brands—Garelick Farms, Morning Glory, and Farm Fresh— will transfer to the divestiture buyers of the plants where the local or sub-regional branded products are sold. Garelick Farms will transfer to the buyer of the Franklin Plant. Morning Glory and Farm Fresh will transfer to the buyer of the De Pere Plant. Transferring ownership of these brands will place the divestiture buyers in the same position as Dean was before the transaction with respect to these local or sub-regional brands.

13

The buyer(s) of the Divestiture Plants will receive licenses—rather than ownership—to use the national and regional brands (*i.e.*, Dairy Pure, TruMoo, and "Dean's") in geographic areas that cover nearly all of each of the Divestiture Plants' existing sales footprints. The proposed Final Judgment provides licenses rather than ownership for these brands because the brands are used across the United States. Most Dean plants sell at least some TruMoo, "Dean's," and Dairy Pure brand products, and an overwhelming majority of the sales for these brands come from Dean plants that DFA has acquired and is retaining. In contrast, the local or sub-regional brands that are being divested are used at a smaller number of Dean plants in smaller areas surrounding the Divestiture Plants.

The divestiture buyer of each Divestiture Plant will receive transitional licenses to the national brands, TruMoo and Dairy Pure. Because Dairy Pure frequently is cobranded, the divestiture buyer will be able to use the transitional license to continue to cobrand products while it changes its packaging and rebrands its products. The TruMoo brand makes up a small percentage of the sales at the Divestiture Plants and is not necessary for the future viability of the Divestiture Plants and related business. Therefore, the divestiture buyers will each receive a transitional license for the TruMoo brand. They will also receive a perpetual license to the intellectual property, product formulas, technology, and know-how for TruMoo because consumers value the taste of the TruMoo milk and the divestiture buyers will benefit from the ability to perpetually offer chocolate milk with the same taste. These TruMoo licenses will permit each buyer to transition chocolate milk sales to its local or sub-regional brand, the "Dean's" brand, or another brand of its choice while continuing to use the same chocolate milk formula perpetually.

If the buyer of the Harvard Plant and the De Pere Plant are the same, as the proposed Final Judgment anticipates, the buyer will receive a perpetual license to the "Dean's" brand that it could use for sales within a multistate area set forth in the proposed Final Judgment from either or both plants. If the buyers of the two plants are different, the buyer of the Harvard Plant, and not the buyer of the De Pere Plant, will receive a perpetual license to the "Dean's" brand. This accounts for the fact that the Harvard Plant sells more than two times the amount of "Dean's" brand Fluid Milk as compared to the De Pere Plant and the buyer of the Harvard Plant will not receive a perpetual license or ownership of any other brand. If a separate buyer acquires the De Pere Plant, it will receive a transitional license to the "Dean's" brand. This transitional license will give the buyer the opportunity to move sales to its local or sub-regional brands or another brand.

The proposed Final Judgment requires these transfers and licenses so that the divestiture buyers will be placed, to the greatest extent possible, in the same position as Dean prior to the transaction and will have the ability to operate the Divestiture Plants as independent and ongoing business concerns.

### 1. *Franklin Plant*

Under the proposed Final Judgment, the divestiture buyer of the Franklin Plant will own the local and sub-regional brands used at the Franklin Plant and receive transitional licenses for the national brands. The Franklin Plant currently uses the Garelick Farms brand and the national brands Dairy Pure and TruMoo. Garelick Farms branded products are sold throughout New England. Ownership of the Garelick Farms brand will transfer to the buyer of the Franklin Plant. The buyer of the Franklin Plant will also receive a non-exclusive, royalty-free, paid-up, irrevocable, nationwide two-year transitional license for both the Dairy Pure and TruMoo

national brands. The Dairy Pure license ensures that the buyer will have sufficient time to transition away from the cobranding of Dairy Pure with Garelick Farms. Similarly, the TruMoo license will permit the buyer time to transition its chocolate milk to the Garelick Farms brand or develop its own chocolate milk brand. In order to ensure consistency in the quality of the TruMoo branded products and to allow the divestiture buyer to offer its own chocolate milk brand without altering the taste that consumers may prefer, the divestiture assets also include a non-exclusive, royalty-free, paid-up, irrevocable, perpetual, nationwide license to the intellectual property, including the formula and know-how, for the TruMoo products.

### 2. *Harvard Plant*

Under the proposed Final Judgment, the divestiture buyer of the Harvard Plant will receive perpetual licenses to the regional "Dean's" brand and transitional licenses for the national brands. The Harvard Plant currently uses the regional "Dean's" brand and the national brands Dairy Pure and TruMoo. Because the Harvard Plant relies on the "Dean's" brand for its branded sales, the buyer will receive an exclusive, royalty-free, paid-up, irrevocable, perpetual license to use the "Dean's" brand in Illinois, Wisconsin, Indiana, and the Upper Peninsula of Michigan. Further, the buyer will receive a non-exclusive, royalty-free, paid-up, irrevocable, perpetual license to use the "Dean's" brand in Minnesota, Iowa, and the Lower Peninsula of Michigan. The geographies where the buyer's license is exclusive represents the primary area where the Harvard Plant sells its products. The addition of the non-exclusive geographies ensures that the buyer will be able to offer the same brand to more distant customers and will not be hampered in its ability to compete in those more distant geographies. The divestiture assets for the Harvard Plant also include the same transitional licenses to Dairy Pure and TruMoo, as well

as the same perpetual license for the TruMoo intellectual property, as the divestiture assets for the Franklin Plant.

### 3.    *De Pere Plant*

Under the proposed Final Judgment, the divestiture buyer of the De Pere Plant will own the local brands that are primarily used by the De Pere plant and will receive transitional licenses for the national brands and regional "Dean's" brand. The De Pere Plant currently uses the local Morning Glory, Farm Fresh, and Jilbert brands, the national brands Dairy Pure and TruMoo, and the regional "Dean's" brand. Ownership of the Morning Glory and Farm Fresh brands, both of which are strong local brands, will transfer to the buyer of the De Pere Plant. The buyer of the De Pere Plant also will receive the same transitional licenses to Dairy Pure and TruMoo, as well as the same perpetual license for the TruMoo intellectual property, as the buyers of the Franklin Plant and the Harvard Plant. In addition to ownership of the local brands and licenses to the national brands, the De Pere Plant buyer will receive a two-year non-exclusive, royalty-free, paid-up, irrevocable, nationwide license to use the "Dean's" brand. This transitional license will ensure that, in the event that the buyer of the De Pere Plant is not the same as the buyer of the Harvard Plant, the De Pere Plant buyer will have sufficient time to transition away from cobranding. If, as expected, the buyer of the De Pere Plant is also the buyer of the Harvard Plant, the buyer will also be able to use the perpetual "Dean's" license from the Harvard Plant divestiture to cover sales from the De Pere Plant within the applicable geography. Though the De Pere Plant also sells some products under the local Jilbert brand, those sales are *de minimis*. Because of the very limited use of that brand, which is used primarily by a plant that is not subject to divestiture, the Jilbert brand is not a part of the De Pere divestiture assets.

### (C)     Other Provisions

In order to preserve competition and facilitate the success of the potential divestiture buyers, the proposed Final Judgment contains additional obligations for Defendants. Paragraph IV(C) of the proposed Final Judgment requires Defendants to facilitate each buyer's hiring of employees whose jobs relate to the processing, marketing, sale, or distribution of Fluid Milk or any other products by the Divestiture Plants. In particular, the proposed Final Judgment requires that Defendants provide each buyer, the United States, and the Plaintiff States, with organization charts and information relating to the employees and make employees available for interviews. It also provides that Defendants must not interfere with any negotiations to hire these employees by a buyer of these assets. In addition, for employees who elect employment with a buyer, Defendants must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, and provide all benefits that the employees would generally have been provided if the employees had continued employment with Defendants. This provision will help to ensure that the buyers will be able to hire qualified employees for the Divestiture Plants and related businesses.

Paragraph IV(G) of the proposed Final Judgment facilitates the transfer of customers and other contractual relationships from Defendants to each buyer. Defendants must transfer all contracts, agreements, and customer relationships. For those contracts, agreements, or customer relationships that extend beyond the Divestiture Plants, Defendants must transfer the relevant portions of those contracts, agreements, or customer relationships. For contracts or agreements that require another party's consent to transfer, Defendants must use their best efforts to accomplish the transfer. The paragraph also requires Defendants to send a letter to any customer of a Divestiture Plant that does not have a written contract within five business days of the

closing of the divestiture of the relevant Divestiture Plant. The letter, which is subject to the prior approval of the United States, must notify each such customer that the buyer of the Divestiture Plant will be the customer's new supplier. This provision will help initiate contact between the buyer and the customer so that a relationship can be immediately established. Defendants may not interfere with any negotiations between a buyer and a customer or another contracting party. Finally, Defendants must release each buyer from any of Dean's obligations to purchase raw milk from DFA, allowing the buyer to seek its own suppliers for raw milk and not be beholden to DFA. Defendants are, however, required to enter into a supply contract for raw milk for a transitional period at the option of each buyer, as described below, to ensure that the buyer has an adequate supply as it takes over operations.

Paragraph IV(H) of the proposed Final Judgment requires Defendants to use best efforts to help each buyer apply for and secure any necessary governmental approval for any governmental license or authorization that cannot be transferred to the buyer. This provision will help to facilitate the transition of the business to the buyer without disruption due to any issues involving governmental licensures or authorizations.

Paragraph IV(I) of the proposed Final Judgment requires Defendants, at the option of each buyer, to enter raw milk supply agreements sufficient to meet each buyer's needs for up to three months. The United States, in its sole discretion, and upon the buyer's request, may approve an extension for up to an additional three months. This provision will help to ensure that the buyers will not face disruption to their supply of raw milk during this important transitional period.

Paragraph IV(J) of the proposed Final Judgment requires Defendants, at the option of each buyer, to enter agreements to provide transition services for a period of up to six months

(with an option for the United States, after consultation with the Plaintiff States, to extend the period for an additional six months, in its sole discretion) to facilitate the transfer and operation of the relevant divestiture assets. This paragraph further provides that employees of Defendants tasked with supporting these agreements must not share any competitively sensitive information of the buyers with any other employees of Defendants.

Paragraph IV(L) of the proposed Final Judgment prohibits, for a period of one year, Defendants from soliciting business from customers supplied from a Divestiture Plant by initiating customer-specific communications for the portion of that customer's business that is covered by a contract, agreement, or relationship that is included in the divestiture assets. This prohibition will help each buyer establish and maintain important customer relationships.

Paragraph IV(M) addresses the fact that the Franklin Plant is located on leased property. Dean had an unassignable option to acquire the land, which it had not exercised. Through the bankruptcy process, the otherwise unassignable option was assigned to DFA but cannot be further assigned to the divestiture buyer of the Franklin Plant. Paragraph IV(M) requires DFA, at the Franklin Plant buyer's request, to (1) exercise DFA's non-assignable option to purchase the real estate on which the Franklin Plant is located, and (2) sell to the buyer of the Franklin Plant the real estate at the same price that DFA pays for the property under DFA's non-assignable option to purchase. This provision puts the buyer of the Franklin Plant in the same position as Dean before DFA acquired the Dean assets by providing the buyer with the same option to acquire the real estate that Dean had, even though the option is non-assignable and therefore cannot be included in the Franklin Plant divestiture assets.

If Defendants do not accomplish the divestitures within the period prescribed in the proposed Final Judgment, or if Defendants waive their right to first attempt to divest the Franklin

Plant and related assets, or the Harvard Plant and De Pere Plant and their related assets, as permitted by Paragraph V(A) of the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a divestiture trustee selected by the United States to effect the divestitures, or a portion thereof. If a divestiture trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The divestiture trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After the divestiture trustee's appointment becomes effective, the trustee will provide monthly reports to the United States and Plaintiff States setting forth his or her efforts to accomplish the divestiture.

At the end of an initial term of 60 days (with extensions that may be granted in the sole discretion of the United States not to exceed an additional 60 days), if the divestiture of the Divestiture Plants and other divestiture assets has not been accomplished, DFA can file a motion with the Court requesting that the Stipulation and Order be terminated and the Final Judgment be modified to allow DFA to retain those divestiture assets. This option for the divestiture assets to potentially revert back to DFA is included because of Dean's dire financial circumstance, the distressed condition of the Fluid Milk industry, the likelihood of additional Fluid Milk processing plant closures, and the desire to keep the plants operating, rather than shutting them down if buyers cannot be found. This will allow customers to continue having an adequate supply of Fluid Milk.

The proposed Final Judgment contains a notification provision in Section XI designed to give the United States the opportunity to review all of Defendants' future acquisitions, including acquisitions of partial or indirect interests, that involve entities that have generated more than $1 million in revenue from the processing, marketing, sale, and distribution of Fluid Milk in the

prior completed calendar year. Section XI requires DFA to notify the United States, and any Plaintiff State in which any of the assets or interests are located or whose border is less than 150 miles from any such assets or interests, in the same form, with some modifications, as it would for a Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act") filing, as specified in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations. Notice must be made 30 calendar days before the acquisition. Section XI further provides for waiting periods and opportunities for the United States to obtain additional information similar to the provisions of the HSR Act before such acquisitions can be consummated. This provision ensures that the United States and relevant Plaintiff States will have the opportunity to review, for example, any future acquisitions of additional Dean assets by DFA. In particular, this provision would require advance notice of any attempt by DFA to acquire the Land O'Lakes plants in Woodbury, Minnesota; Sioux Falls, South Dakota; and Bismarck, North Dakota, which DFA did not include in its present acquisition due to the competitive concerns expressed to DFA by the United States.

Section XII of the proposed Final Judgment prevents Defendants from reacquiring any part of or interest in the divestiture assets without prior consent from the United States, after consultation with the Plaintiff States. It also prevents Defendants from entering new collaborations or expanding existing collaborations involving the divestiture assets without prior consent.

The proposed Final Judgment also contains provisions designed to promote compliance and make the enforcement of the Final Judgment as effective as possible. Paragraph XIV(A) provides that the United States retains and reserves all rights to enforce the provisions of the Final Judgment, including its rights to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show

cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph XIV(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to restore competition that the United States alleged would otherwise be harmed by the transaction. Defendants agree that they will abide by the proposed Final Judgment, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XIV(C) of the proposed Final Judgment provides that if the Court finds in an enforcement proceeding that Defendants have violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XIV(C) provides that in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant will reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Paragraph XIV(D) states that the United States may file an action against a Defendant for violating the Final Judgment for up to four years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XV of the proposed Final Judgment provides that the Final Judgment will expire ten years from the date of its entry, except that after five years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture has been completed and that the continuation of the Final Judgment is no longer necessary or in the public interest.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.  PROCEDURES AVAILABLE FOR MODIFICATION
## OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

Eric D. Welsh
Acting Chief
Healthcare and Consumer Products Section
Antitrust Division
U.S. Department of Justice
450 Fifth Street, NW, Suite 4100
Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against DFA's acquisition of certain assets from Dean. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will remedy the anticompetitive effects alleged in the Complaint, preserving competition for the processing and sale of Fluid Milk in northeastern Illinois and Wisconsin and in New England. Thus, the proposed Final Judgment achieves all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.  STANDARD OF REVIEW UNDER THE APPA FOR
## THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

>  (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be

left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Id.* at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final

Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney

explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.  DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States has considered one determinative document within the meaning of the APPA, a May 1, 2020 letter from Richard P. Smith, President and Chief Executive Officer of DFA, to the United States Department of Justice, Antitrust Division and to the Capper-Volstead Act Committee, United States Department of Agriculture ("Letter"). The Letter is included as Attachment 1 to this Competitive Impact Statement.

DFA has previously asserted that the Capper-Volstead Act, 7 U.S.C. §§ 291–292, permits farmers and cooperatives collectively to market not only raw milk, but also processed Fluid Milk. The United States, however, does not agree with DFA's categorical assertion, which raises questions of fact and of unsettled law.

Through the Letter, DFA has committed not to jointly process, market, or sell Fluid Milk with agricultural cooperatives or producers (other than its own farmer members) and has waived any right to assert in any legal, regulatory, administrative, or adjudicative proceeding that such conduct is exempt from the antitrust laws or otherwise permissible under Section 6 of the Clayton Act or the Capper-Volstead Act. The Letter, which provides additional detail, decreases

the likelihood that DFA would harm competition through coordination on output and prices of Fluid Milk.

Dated: May 26, 2020

Respectfully submitted,

_____ /s/  Karl D. Knutsen _____
Karl D. Knutsen
Nathaniel J. Harris
U.S. Department of Justice
Antitrust Division
Healthcare and Consumer Products Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
202-514-0976
karl.knutsen@usdoj.gov