# UNITED STATES DISTRICT COURT
# FOR NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> COMMONWEALTH OF MASSACHUSETTS, <br><br> and <br><br> STATE OF WISCONSIN, <br><br> *Plaintiffs,* <br><br> v. <br><br> DAIRY FARMERS OF AMERICA, INC. <br><br> and <br><br> DEAN FOODS COMPANY, <br><br> *Defendants*. | No. 20 C 2658 <br><br> Judge Feinerman |

## RESPONSE OF PLAINTIFF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT

Pursuant to the requirements of the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(b)–(h), the United States submits this response to the one public comment received regarding the proposed Final Judgment in this case. After careful consideration of the submitted comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaint. The United States will move the Court for entry of the proposed Final Judgment after the public comment and this response have been published pursuant to 15 U.S.C § 16(d).

## I. PROCEDURAL HISTORY

Dean Foods Company ("Dean") filed for bankruptcy on November 12, 2019, in the United States Bankruptcy Court for the Southern District of Texas. The bankruptcy court ordered an auction and then accelerated the auction process because of Dean's liquidity condition. On March 30, 2020, Dairy Farmers of America, Inc. ("DFA") bid for 44 of Dean's plants for a total value of $433 million.[1] No other bidder submitted a bid for all of the 44 Dean plants, or anything even close to that number of plants, under the bankruptcy court's schedule. The bid was accepted by Dean and was the only transaction for those 44 plants approved by the bankruptcy court.

The United States, along with the State of Wisconsin and the Commonwealth of Massachusetts (collectively, the "Plaintiff States"), filed a civil antitrust complaint on May 1, 2020, seeking to enjoin the proposed transaction. Based on a comprehensive investigation, the Complaint (Docket No. 1) alleges that the likely effect of this transaction would be to substantially lessen competition for the processing and sale of fluid milk in areas encompassing (1) northeastern Illinois and Wisconsin and (2) New England in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The Complaint alleges that DFA and Dean compete head-to-head to sell fluid milk to customers in these geographic areas, including supermarkets, schools, convenience stores, and hospitals.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment (Docket No. 4-2) and an Asset Preservation and Hold Separate Stipulation and Order

---

[1] During its investigation, the Department also expressed concerns to DFA and Dean about the potential loss of competition for the sale and processing of fluid milk if DFA were to acquire Dean's fluid milk processing plants in Minnesota, South Dakota, and North Dakota. DFA subsequently ceased its efforts to acquire those plants.

2

("Stipulation and Order") (Docket No. 4), signed by the parties that consents to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act, 15 U.S.C. § 16. Pursuant to requirements under the Tunney Act, the United States filed the Competitive Impact Statement with this Court on May 26, 2020 (Docket No. 16), describing the transaction and the proposed Final Judgment. The United States then published the Complaint, proposed Final Judgment, and Competitive Impact Statement in the *Federal Register* on June 2, 2020, *see* 15 U.S.C. § 16(b)-(c); 85 Fed. Reg. 33,712 (June 2, 2020), and caused notice regarding the same, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in the *Washington Post*, *Chicago Tribune*, and *Boston Globe* on June 1–4 and June 8–10, 2020. The 60-day period for public comment ended on August 10, 2020. The United States received one comment concerning the allegations in the Complaint (Exhibit 1).

## II. THE COMPLAINT AND THE PROPOSED FINAL JUDGMENT

The Complaint alleges that the likely effect of this transaction would be to substantially lessen competition for the processing and sale of fluid milk in (1) northeastern Illinois and Wisconsin and (2) New England in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Under the proposed Final Judgment and Stipulation and Order, which are designed to address the anticompetitive effects of the acquisition, DFA is required to divest Dean's fluid milk processing plants, ancillary facilities, and related tangible and intangible assets located in Franklin, Massachusetts ("Franklin Plant"); De Pere, Wisconsin ("De Pere Plant"); and Harvard, Illinois ("Harvard Plant") (collectively the "Divestiture Plants").

As the Complaint alleges, northeastern Illinois and Wisconsin and New England each represent a relevant market where the merger would reduce the number of competitors from three to two. DFA's existing fluid milk processing plants overlap with two Dean plants that it

3

proposed to acquire in northeastern Illinois and Wisconsin—the Harvard Plant and the De Pere Plant—and with Dean's Franklin Plant in New England. The Complaint further alleges that DFA and Dean are two of only three significant fluid milk processors that can serve customers, including supermarkets and schools, in each of these geographic areas. If the acquisition were permitted to proceed, DFA would control nearly 70% of the fluid milk market in northeastern Illinois and Wisconsin and approximately 51% of the fluid milk market in New England. DFA and Dean competed head-to-head to supply fluid milk customers in these areas before the merger, and customers have relied on competition between DFA and Dean to get lower prices and better terms. If DFA's and Dean's plants in these areas were owned by a single entity, this competitive dynamic would no longer exist, leading to higher prices and inferior service for supermarkets, schools, and other fluid milk customers and ultimately, millions of individual consumers.

The proposed Final Judgment requires DFA to divest the Franklin Plant, De Pere Plant, and Harvard Plant. It defines three sets of divestiture assets, one for each Divestiture Plant, that include assets necessary to process, market, sell, and distribute fluid milk and other products by each of the Divestiture Plants. The divestiture assets also include brands and/or brand licenses which will allow the buyer of each Divestiture Plant to successfully market its milk. Each set of assets must be divested in such a way as to satisfy the United States, in its sole discretion, after consultation with the Plaintiff States, that they can and will be operated by the purchaser as a viable, ongoing business that can compete effectively in the market for the processing and sale of fluid milk in (1) northeastern Illinois and Wisconsin or (2) New England.

Plaintiffs and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate

4

this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

### III. STANDARD OF JUDICIAL REVIEW

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1).[2] In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C.

---

[2] The United States District Court for the Northern District of Illinois has entered a number of antitrust consent decrees. *See, e.g.*, *United States v. National Association of Realtors*, 2008 WL 5411637 (N.D. Ill. Nov. 18, 2008) (Kennelly, J.); *United States v. Earthgrains Co.*, 2000 WL 33115003 (N.D. Ill. July 3, 2000) (Bucklo, J.).

5

Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable"); *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 637–38 (S.D.N.Y. 2011); *see SEC v. Citigroup Global Markets Inc.*, 673 F.3d 158, 168 (2d Cir. 2012) ("We are bound in such matters to give deference to an executive agency's assessment of the public interest.").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62; *United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (citing *Microsoft*, 56 F.3d at 1458, 1461–62). With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may "not make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting

6

settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*[3]

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). In determining whether a proposed settlement is in the public interest, a district court "is not permitted to reject the proposed remedies merely because the court believes

---

[3] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

7

other remedies are preferable." *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 567 (S.D.N.Y. 2012) (quoting *United States v. Abitibi–Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633 637–38 (S.D.N.Y. 2011) ("The Court's function is not to determine whether the proposed [d]ecree results in the balance of rights and liabilities that is the one that will best serve society, but only to ensure that the resulting settlement is 'within the reaches of the public interest.'" (quoting *United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 238 (S.D.N.Y. 1997)); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60. *See also*, *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision

8

about which claims to bring "has long been regarded as the special province of the Executive Branch.").

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## IV. PUBLIC COMMENT AND THE UNITED STATES' RESPONSE

During the 60-day comment period, the United States received a single comment. The comment is from Martin T. Petroski, a dairy farmer in Pennsylvania. Upon review, the United States believes that nothing in the comment warrants a change to the proposed Final Judgment or supports a conclusion that the proposed Final Judgment is not in the public interest. As required by the APPA, the comment, with the author's address and phone number removed, and this response will be published in the *Federal Register*.

9

The comment expresses criticism of DFA, claiming that DFA is too large and engages in anticompetitive conduct in general. The comment, however, does not appear to be in any way critical of the merger. The comment, for example, does not refer to any of the allegations in the Complaint nor to the impact of the proposed Final Judgment.

The proposed Final Judgment addresses each alleged competitive harm that the merger presented. As Plaintiffs allege in the Complaint and the United States explains in the Competitive Impact Statement, the proposed merger, without the remedy in the proposed Final Judgment, would have substantially lessened competition for the processing and sale of fluid milk in two geographic markets—northeastern Illinois and Wisconsin and New England—in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

The proposed Final Judgment addresses the harm that the Complaint alleges by preventing an increase in concentration in these two fluid milk processing markets. The proposed Final Judgment maintains competition at pre-merger levels in both markets in which the Complaint alleges that the merger would substantially reduce competition. The proposed Final Judgment requires DFA to divest the Dean plants in northeastern Illinois and northern Wisconsin which compete with a DFA fluid milk processing plant. Similarly, the proposed Final Judgment requires DFA to divest the Dean plant near Boston which competes against other DFA fluid milk processing plants.

The comment also states that DFA is the "only market," without identifying any specific geographic location or clearly describing the market to which it refers. From the context in which the commenter uses this phrase, the United States understands this part of the comment to relate to DFA's actions as a dairy cooperative, buying raw milk from its farmer members and coordinating the sale of milk from independent farmers. To the extent this comment advances a

10

claim about DFA's purchase of raw milk from farmers, the comment is discussing the sale of *raw* milk from farmers or cooperatives to processors, not the sale of processed *fluid milk* from dairy processors to retailers and schools that the Complaint addresses. Because the United States did not make any claims relating to any raw milk markets in its Complaint, this part of the comment is outside the scope of what this Court is asked to review under the Tunney Act.

The comment closes by raising concerns about farmers dumping raw milk rather than selling it to processors. But farmers began dumping raw milk as a result of conditions caused by the COVID-19 pandemic before the merger was consummated on May 1, 2020, making it clear that the merger did not cause farmers to dump milk. *See e.g.,* Jesse Newman & Jacob Bunge, *Farmers Dump Milk, Break Eggs, as Restaurant Closings Destroy Demand,* WALL STREET J. (April 9, 2020). The COVID-19 pandemic and consequent closing of schools also complicated the dairy supply chain and reduced demand. *See, e.g.,* David Yaffe-Bellany & Michael Corkery, *Dumped Milk, Smashed Eggs, and Plowed Vegetables: Food Waste of the Pandemic*, N.Y. TIMES (April 11, 2020) ("Major consumers of dairy, like public schools and coffee shops, have all but vanished, leaving milk processing plants with fewer customers at a time of year when cows produce milk at their fastest rate."). Finally, concerns relating to raw milk are in any event outside the scope of the harm alleged in the Complaint and, therefore, outside the scope of what this Court is asked to review under the Tunney Act.

In summary, while the commenter appears to criticize several aspects or actions of DFA, the commenter does not appear to be in any way critical of the merger or to provide any criticism of any part of the remedy that the United States and Defendants have agreed to in the proposed Final Judgment. For these reasons, the United States believes that nothing in the comment

11

warrants a change to the proposed Final Judgment or supports a conclusion that the proposed Final Judgment is not in the public interest

## V. CONCLUSION

After reviewing the public comment, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint, and is therefore in the public interest. The United States will move this Court to enter the proposed Final Judgment after the comment and this response are published in the *Federal Register*.

Dated: September 14, 2020

        Respectfully submitted,

       /s/ Karl D. Knutsen
Karl D. Knutsen
Justin Heipp
Nathaniel J. Harris
Christopher A. Wetzel
U.S. Department of Justice
Antitrust Division
Healthcare and Consumer Products Section
450 Fifth Street, NW, Suite 4100
Washington, DC 20530
202-514-0976
karl.knutsen@usdoj.gov

## **CERTIFICATE OF SERVICE**

I, Karl D. Knutsen, hereby certify that on September 14, 2020, I caused a copy of the foregoing Response of United States to Public Comments on the Proposed Final Judgment to be served on Defendants by mailing the document electronically to their duly authorized legal representatives as follows:

For Defendant Dairy Farmers of America, Inc.:

W. TODD MILLER
Baker & Miller
2401 Pennsylvania Ave., NW
Washington, DC 20037
Tel: (202) 663-7822
Fax: (202) 663-7849
tmiller@bakerandmiller.com

MICHAEL G. EGGE
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2285
Fax: (202) 637-2201
michael.egge@lw.com

GARRET RASMUSSEN
Orrick Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Tel: (202) 339-8481
Fax: (202) 339-8500
grasmussen@orrick.com

For Defendant Dean Foods Company:

ARTHUR J. BURKE
Davis Polk LLP
450 Lexington Ave.
New York, NY
Tel: (212) 450-4352
Fax: (212) 701-5800
arthur.burke@davispolk.com

And other ECF registered users by ECF. Mr. Petroski will be provided a copy of this filing by US mail or other non-electronic means.

    /s/ Karl D. Knutsen
Karl D. Knutsen
Attorney for the United States
U.S. Department of Justice Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, DC 20530
Tel.: 202-514-0976
Fax: 202-307-5802
E-mail: karl.knutsen@usdoj.gov